FILED
United States Court of Appeals
Tenth Circuit

May 9, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

VIRGIL ANDERSON-BEY,

Petitioner - Appellant,

v.

No. 10-1159

ARISTEDES ZAVARAS, Executive
Director, Colorado Department of
Corrections,

Respondent - Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:07-CV-01491-RPM-BNB)**

Michael J. Heher, Corvallis, Oregon, (Philip A. Cherner, Denver, Colorado, with
him on the briefs), for Petitioner - Appellant.

Christine C. Brady, Assistant Attorney General, (John W. Suthers, Attorney
General, with her on the brief), Denver, Colorado, for Respondent - Appellee.

Before **HARTZ**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

**HARTZ**, Circuit Judge.

Defendant Virgil Anderson-Bey, a prisoner of the State of Colorado,

applied for a writ of habeas corpus in the United States District Court for the

District of Colorado. *See* 28 U.S.C. § 2254. He asserted that there was insufficient evidence to support his conviction of robbing a sandwich-shop employee and that his state sentence was improperly enhanced by an invalid prior conviction. The district court denied his application but granted a certificate of appealability (COA) to enable him to appeal to this court. *See* 28 U.S.C. § 2253(c)(1)(A). We have jurisdiction under 28 U.S.C. § 1291 and affirm. Defendant's insufficient-evidence claim amounts to a challenge to a state-court interpretation of state law, which cannot be the basis of federal habeas relief. And his claim that his prior state conviction was invalid is not cognizable under § 2254 because he has served the sentence on that conviction and he had counsel when he pleaded guilty in that case.

## I.    BACKGROUND

On February 6, 1988, Defendant entered a sandwich shop in Aurora, Colorado, near closing time. He ordered a sandwich from employee Joseph Sandoval. But when Sandoval went to the back of the store to prepare the sandwich, Defendant held a knife to Matthew Martin, another employee, who had been mopping the floor. Defendant led Martin to the cash register and ordered both employees to open it. He threatened to kill them unless he received the money. Sandoval opened the cash register. Defendant took $234 from it, told the two employees to lie on the floor, and left the store.

An information filed on March 16, 1988, charged Defendant with two counts of robbery, one for each of the two store employees, and one count of theft. It also asserted that Defendant was a habitual offender because he had been convicted of two prior felonies, having pleaded guilty to criminal trespass in 1983 and robbery in 1985. Defendant challenged the validity of the 1983 conviction but the trial court ruled that his challenge was untimely. A jury found Defendant guilty of both the robberies and the theft and that he had previously been convicted in 1983 and 1985. In accordance with the Colorado habitual-offender statute, Colo. Rev. Stat. § 16-13-101 (1990), the court sentenced Defendant to 25 years' imprisonment for each robbery, with the sentences to be served consecutively, and to six months' imprisonment on the theft conviction, with the sentence to be served concurrently with his other sentences.

On direct appeal Defendant argued, among other issues, that the trial court had erred in ruling that his challenge to his 1983 conviction was untimely. In 1992 the Colorado Court of Appeals agreed and ordered the trial court to hold an evidentiary hearing on the challenge. At the hearing Defendant contended that his 1983 guilty plea was invalid because he had never been advised of his right to court-appointed counsel if he could not afford an attorney. Although he had retained counsel for the 1983 proceeding, he testified that he had pleaded guilty because his parents could not afford to continue to pay the lawyer if the case went to trial. The trial court found that the 1983 conviction was constitutional because

Defendant had a lawyer when he pleaded guilty and he had stated at the time that he was satisfied with that lawyer's representation. In 1995 the Colorado Court of Appeals affirmed that decision and the Colorado Supreme Court denied certiorari.

In 1997 Defendant sought state postconviction relief. He argued that there was insufficient evidence to convict him of robbing Martin because there was no evidence that Martin, whose duties at the sandwich shop were only to make sandwiches and clean up, had possession of the money taken from the cash register. The trial court denied the motion and the Colorado Court of Appeals affirmed in 1999. The court of appeals stated that Martin had sufficient control of the money because he knew where it was hidden in the store after being removed from the cash register and he was responsible for "closing and securing the establishment at the conclusion of the day's business." R., Vol. II at 267 (internal quotation marks omitted). The Colorado Supreme Court denied certiorari.

Defendant then filed a second motion for state postconviction relief. Following a recent Colorado Court of Appeals decision, the state trial court ordered that the second conviction for robbery be vacated as multiplicitous. But the Colorado Supreme Court later reversed the court of appeals decision and the trial court reinstated the second robbery conviction and original sentence. Defendant appealed, arguing that his two convictions for robbery subjected him to double jeopardy and that there was insufficient evidence to convict him of the second robbery because Martin did not have control of the money. The Colorado

Court of Appeals rejected these arguments, noting that the sufficiency-of-the-evidence challenge had already been resolved by its 1999 decision. The Colorado Supreme Court denied certiorari in 2007.

On July 16, 2007, Defendant filed the present application for relief under § 2254. The application raised three claims: (1) that there was insufficient evidence that he had robbed Martin because Martin did not have control over the money in the cash register; (2) that his 1983 guilty plea was invalid because he was not told of his right to appointed counsel, so that conviction could not be used to enhance his sentence; and (3) that the two counts of aggravated robbery and the resulting sentences violated his rights under the Double Jeopardy Clause, a claim he has not pursued on appeal. The district court rejected all three claims on the merits.

## II. DISCUSSION

We address in turn Defendant's two arguments on appeal.

### A. Sufficiency of the Evidence of Robbery

Defendant argues that there was insufficient evidence to convict him of robbing Martin. A § 2254 "applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see Torres v. Lytle*, 461 F.3d 1303, 1304, 1313–14 (10th Cir. 2006) (granting habeas application because defendant was convicted of

retaliating against a witness despite absence of evidence that defendant knew that victim had told authorities about defendant's commission of a felony).

To assess the sufficiency of the evidence, we first determine the elements of the offense and then examine whether the evidence suffices to establish each element. State law governs what the elements are. *See Valdez v. Bravo*, 373 F.3d 1093, 1097, 1099 (10th Cir. 2004) (evidence was sufficient to find defendant guilty of being an accessory to second-degree murder, because under New Mexico law the intent to kill need not be formed before the defendant arrives at the scene of the crime). Even if we believe that the state courts misinterpreted state law in upholding a defendant's convictions, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see Rael v. Sullivan*, 918 F.2d 874, 876–77 (10th Cir. 1990) (habeas relief not warranted based on allegedly faulty jury instruction because any error was in state courts' interpretation of state law).

Ordinarily it is clear whether a challenge to a state court's ruling on the sufficiency of the evidence is a challenge under *Jackson* or a challenge to the court's interpretation of state law. For example, there is no doubt that a challenge is a *Jackson* challenge when the defendant is arguing that the evidence would not support an inference that he knew that his victim had provided information against him relating to an alleged felony, *see Torres*, 461 F.3d at 1304, or when the issue is whether there was evidence that the defendant had an intent to kill at

-6-

the requisite time, *see Valdez*, 373 F.3d at 1099. And a challenge would clearly be to an interpretation of state law (and therefore barred by *Estelle*) if the defendant argued that the state court erred by holding that the prosecution did not need to prove his intent to kill before he arrived at the scene of the crime. *See id.* at 1098–99.

But sometimes it is not so easy to categorize the nature of the challenge. The difficulty is most likely to arise when an element of the crime is expressed with terms of uncertain meaning (such as, as we shall see, *depraved*, *remained present*, and *control*). In that circumstance, when a state court rules that there was sufficient evidence of the element, it is engaging in a two-step process: first, it clarifies the meaning of the uncertain term by deciding what historical facts suffice or are not necessary to establish the element, and second, it decides that the evidence at trial supports an inference that the necessary historical facts were present. *Estelle* bars our review of the first step; *Jackson* governs our review of the second.

Several of our fellow circuits have addressed challenges to convictions that are framed as *Jackson* issues but on analysis turn out to be challenges to state-court interpretation of state law, which are barred by *Estelle*. One rather straightforward case is *Ponnapula v. Spitzer*, 297 F.3d 172 (2d Cir. 2002), in which the court reviewed Ponnapula's conviction of stealing more than $1 million. *See id.* at 180–81. Ponnapula raised a *Jackson* challenge (although

citing a different Supreme Court decision), arguing that even if he was responsible for a fraudulent $1.9 million bank loan, the bank had lost less than $1 million once it had sold the collateral for the loan. *See id.* The state court had rejected the argument. It said that "a taking of over one million dollars was satisfied by a temporary taking in excess of the threshold amount, notwithstanding that the victimized bank's ultimate loss was less than that sum." *Id.* at 181 (internal quotation marks omitted). The Second Circuit held that Ponnapula's challenge to the sufficiency of the evidence boiled down to a challenge to the state appellate court's interpretation of state law, which was not an issue cognizable by the federal court. *Id.* at 182–83.

Two Seventh Circuit opinions are instructive. In *Bates v. McCaughtry*, 934 F.2d 99 (7th Cir. 1991), Bates was convicted of "endanger[ing] another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life," *id.* at 100 (internal quotation marks omitted). He had driven 95 miles per hour to escape a police officer, forcing two other cars off the road during the chase. *See id.* at 100–01. The Wisconsin Supreme Court affirmed his conviction. It concluded that "speeding in an automobile where there is pedestrian or vehicular traffic can be imminently dangerous" and that such speeding while knowing that other cars were present was depraved because it "put the burden of avoidance on the other drivers. If they had not acted (at risk to themselves), Bates would have collided with them." *Id.* at 101 (internal

-8-

quotation marks omitted). Before the Seventh Circuit, Bates raised a sufficiency-of-the-evidence challenge, arguing that his "racetrack" driving could be "imminently dangerous" or "depraved" only if done in rush hour in the center of a city. *See id.* at 103. But the court said there was no federal issue:

> *The facts were largely stipulated at trial, and in this court the parties agree on them.* The dispute concerns the meaning of [the Wisconsin statute], a legal question that Bates litigated and lost in state court. *He cannot obtain a second opinion on the meaning of state law through the maneuver of making a claim under Jackson.*

*Id.* at 101–02 (emphasis added). The court pointed out that whether an element of a crime (call it "Z") can be satisfied only by proof of fact Z' is not a sufficiency-of-the-evidence question but an issue of law for the state court. *See id.* at 102–03. It concluded:

> To say that state law "rightly understood" requires proof of Z', and that the evidence is insufficient because the prosecution failed to establish this, is to use *Jackson* as a back door to review of questions of substantive law.

*Id.* at 103.

In *Curtis v. Montgomery*, 552 F.3d 578, 580 (7th Cir. 2009), the defendant was convicted of aggravated stalking. In Illinois, aggravated stalking requires that the defendant "place[] another person under surveillance on at least two occasions. . . . A person places another under surveillance by remaining present outside the victim's home, work, school or vehicle." *Id.* at 581 (internal quotation marks omitted). One of Curtis's predicate acts of surveillance occurred

-9-

when the woman he was stalking arranged a meeting with him at the behest of police. *See id.* at 580–81. A few minutes after the victim arrived at the meeting place, Curtis began walking toward her car; but she drove away and he was arrested by the police. *See id.* at 580. He argued that his conviction was contrary to *Jackson*, asserting that there was insufficient evidence that he "remained present" outside the victim's car, because he was arrested as he approached it. *See id.* at 588. The Seventh Circuit, however, ruled that his complaint was not a *Jackson* issue but a disagreement with the Illinois court's interpretation of state law. On Curtis's direct appeal the state court of appeals had held that the stalking statute "did not require the State to prove that Curtis remained present outside of [the victim's] car for a set amount of time or that he stopped, stayed, or waited outside of the car," *id.*, and that "it was up to the jury to decide whether the totality of a defendant's actions—including . . . the 'brief period' Curtis was near [the victim's] car—constituted surveillance." *Id.* at 582. The Seventh Circuit concluded:

> Curtis is impermissibly attempting to use a petition for a writ of habeas corpus to press his preferred interpretation of Illinois law. We may not review state-court interpretations of state law. And *petitioners cannot avoid this limitation by recasting their arguments as challenges to a state court's application of Jackson*.

*Id.* (citations omitted and emphasis added). It pointed out that "Curtis does not say how, given this 'timeless' definition of 'remain present,' the evidence was

-10-

insufficient to prove beyond a reasonable doubt that his actions constituted surveillance." *Id.*

Of particular interest is the Sixth Circuit opinion in *Sanford v. Yukins*, 288 F.3d 855 (6th Cir. 2002), because the state courts' interpretation of state law was not explicit. The crime of conviction was aiding and abetting first-degree criminal sexual conduct. *See id.* at 857–58. Sanford and her young children lived with Wilson and her young children. On one occasion Wilson forced her own 11-year-old son to have sexual contact with Sanford's nine-year-old daughter. *See id.* at 857. Sanford was present, but did nothing either to stop Wilson or to encourage her. At one point, however, she left the room and returned with tea for Wilson. *See id.* When Sanford challenged the sufficiency of the evidence, the state trial court relied, at least in part, on the duty of a parent to protect her child. *See id.* at 857–58. On appeal the Michigan Court of Appeals declined to rely on that theory and further stated that an aider and abettor must have "performed acts or g[iven] encouragement which aided and assisted the commission of the crime," and that "mere presence" was not enough to make a person an aider and abettor. *Id.* at 858 (internal quotation marks omitted). Nevertheless, it rejected Sanford's contention that the state had failed to establish that element and concluded that "the prosecution introduced sufficient evidence that Sanford intended the commission of the crime." *Id.* (internal quotation marks omitted). The federal district court granted Sanford habeas relief, ruling that there was insufficient

evidence of the gave-encouragement element. Before doing so, the court had certified to the Michigan Supreme Court the question whether the "silent presence" of Sanford, including her failure to protect her daughter, constituted the necessary encouragement; but the state court declined to decide the matter, saying that it had been resolved by the state court of appeals and that the evidence supported the verdict. *Id.* at 859 (internal quotation marks omitted). The Sixth Circuit reversed. *See id.* at 857. It reasoned that the state courts had implicitly adopted the theory that an aider and abettor "may be silent throughout the commission of the crime but by his demeanor, or through behavior and acts not directly related to the crime, provide 'moral support' that is recognizable to, and relied upon by, the principal." *Id.* at 862. In other words, "intentional presence and emotional support" would be more than "mere presence" and could sustain a conviction. *Id.* at 863 (internal quotation marks omitted). Although "none of the state court opinions in this case expressly adopt this theory," said the court, "it is reasonable to conclude that the Michigan courts were considering it when they affirmed Sanford's conviction." *Id.* at 862. Applying this interpretation of state law, the circuit court ruled that the "evidence supported the conclusion that Sanford's presence during the crimes alleged was, although silent, something beyond 'mere presence'—was, indeed, assistance and encouragement." *Id.* at 863.

In our view, Defendant, as did the appellants in the above four cases, is attempting to challenge a state court's interpretation of state law by "recasting [his] arguments as challenges to a state court's application of *Jackson*." *Curtis*, 552 F.3d at 582. The historical facts, as in *Bates*, 934 F.2d at 101–02, are not disputed, and the Colorado courts' affirmance of Defendant's conviction amounted to a resolution of the state-law issue of "[w]hat is essential to establish an element" of the offense. *Id.* at 103.

We begin with the elements of the crime of robbery in Colorado: "(1) that the defendant (2) in the State of Colorado (3) knowingly (4) took anything of value (5) from the person or presence of [a] victim (6) by the use of force, threats, or intimidation." *People v. Borghesi*, 66 P.3d 93, 97 (Colo. 2003) (brackets and citation omitted). Aggravated robbery has these elements plus "additional elements such as the use of a deadly weapon or putting the person robbed, or any other person, in reasonable fear of death or bodily injury." *Id.* "Colorado's robbery statutes are intended primarily to protect persons, not property," and therefore a defendant can be convicted "on multiple counts of robbery based upon the number of persons in control of the property taken." *Id.* at 102.

The source of dispute in this case is the meaning of "from the . . . presence of" a victim. The Colorado Supreme Court has held that control of the property taken is required. It stated:

-13-

> [P]resence in the context of robbery is not so much a matter of eyesight as it is one of proximity and control: the property taken in the robbery must be close enough to the victim and sufficiently under her control that, had the latter not been subjected to violence or intimidation by the robber, she could have prevented the taking. . . . We hold that property is taken from the presence of another when it is so within the victim's reach, inspection or observation that he or she would be able to retain control over the property but for the force, threats, or intimidation directed by the perpetrator against the victim.

*People v. Bartowsheski*, 661 P.2d 235, 244 (Colo. 1983) (brackets and internal quotation marks omitted); *accord Borghesi*, 66 P.3d at 103.

Defendant's challenge rests on the assertion that Martin lacked the requisite "control over the cash register and its contents." Aplt. Br. at 22–23. He points out that Martin's only duties were "making sandwiches, cleaning up, and stocking," and he contends "that Martin would probably have been fired had he attempted to exercise possession or control over the money in the cash register." *Id.* at 23.

Defendant's factual assertions are essentially correct. The trial evidence on the matter was quite limited. Martin testified that he was a new employee, did not handle the money in the cash register, and did not even know how to operate it. His chief functions were to make sandwiches and keep the premises clean. He knew, however, that money was regularly removed from the cash register and hidden under a cup in the back of the shop; and he closed the business at the end of the day.

-14-

In response to Defendant's challenge to the sufficiency of the evidence, the state appellate court wrote only the following:

> Property is taken from the "presence of another" when it is so within the victim's reach, inspection, or observation that he or she would be able to retain control over the property but for the force, threats, or intimidation directed by the perpetrator against the victim. The victim must be exercising, or have the right to exercise, control over the article taken.
> *Here, the evidence and its inferences support the conclusion that [Martin] had the right or duty to prevent unauthorized access to things of value kept in the shop. [He] knew the location where cash was hidden once it was removed from the register, and was in charge of "closing" and securing the establishment at the conclusion of the day's business. This is sufficient to support a reasonable inference that [Martin] had the right to exercise control over the money taken.*

*People v. Anderson-Bey*, 98CA0646 (Colo. App. Aug. 19, 1999) (unpublished, *available at* R., Vol. 2 pt. 2 at 266–67) (emphasis added, citations omitted).

Although it would have been reasonable to interpret the "control" element of the robbery offense to have required that Martin had at least some responsibility regarding the cash register from which Defendant took the money, the state court did not adopt that interpretation. It did not explicitly express the point. But the court's interpretation is clear from its rejection of Defendant's argument; the rejection could not have been based on the view that Martin had some responsibilities relating to the cash register, because it was undisputed that he did not. *See Sanford*, 288 F.3d at 862 (upholding conviction based on state court's implicit interpretation of state law). It was enough in the court's view that Martin had general responsibilities with respect to property in the store—as

-15-

when he was to close and secure it at the end of the day. (Defendant does not challenge the state court of appeals' recitation of those facts.) Such responsibilities would distinguish Martin from a customer, a mere bystander, or even, as in *People v. Ridenour*, 878 P.2d 23, 26–27 (Colo. App. 1994), an employee with no custodial responsibilities. The Colorado Court of Appeals' opinion affirming Defendant's conviction is an unambiguous statement that proof that Martin had duties regarding the cash register was not necessary to establish that Martin was a victim. *See Bates*, 934 F.2d at 102–03 (whether proof of fact Z' is necessary to prove element of the crime Z is a matter of state substantive law, not a sufficiency-of-the-evidence question).

Accordingly, we hold that Defendant's challenge to the affirmance of his conviction is in essence a challenge to the Colorado Court of Appeals' interpretation of the state robbery statute, a challenge that we cannot entertain in a proceeding under § 2254. *See Estelle*, 502 U.S. at 67–68.[1] We therefore reject the challenge.

B.    **Validity of the 1983 Conviction**

---

[1] In a supplemental-authority letter submitted after oral argument, *see* Fed. R. App. P. 28(j), Defendant contends that if the Colorado courts were merely interpreting state law, then the change in law was applied retroactively, thereby violating his due-process rights. Defendant has "waived [this] argument[], however, because he did not raise [it] on appeal in his opening brief." *United States v. Bowling*, 619 F.3d 1175, 1181 n.1 (10th Cir. 2010).

Defendant challenges the validity of his 1983 criminal-trespass conviction, which was used to enhance his sentence for the robbery convictions in 1988. To obtain relief under § 2254, the applicant must be "in custody" under the challenged judgment. Defendant has completed service of his sentence for his 1983 conviction, but he satisfies the in-custody requirement because that conviction was used to enhance the sentence he is now serving. *See Lackawanna Cnty. Dist. Att'y v. Coss*, 532 U.S. 394, 401 (2001).

Nevertheless, the Supreme Court has imposed strict limits on when such a prior conviction can be reviewed under § 2254. *Lackawanna* said:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

532 U.S. at 403–04 (citation omitted). Defendant does not dispute that his criminal-trespass conviction is no longer open to direct or collateral attack in its own right. But he makes two arguments why *Lackawanna* does not foreclose his claim.

First, noting that *Lackawanna* was "premised on two considerations: 'the need for finality of convictions and ease of administration,'" Reply Br. at 10 (quoting *Lackawanna*, 532 U.S. at 402), he argues that neither consideration

applies here.  But *Lackawanna* did not suggest that its general rule was subject to exceptions based on the circumstances in individual cases.  Rather, it noted only one exception to the rule:  "where there was a failure to appoint counsel in violation of the Sixth Amendment," *Lackawanna*, 532 U.S. at 404; and three of the five members of the Court's majority suggested that there may also be an exception where "a habeas petition directed at the enhanced sentence may effectively be the first and only forum available for review of the prior conviction," *id.* at 406; *see McCormick v. Kline*, 572 F.3d 841, 851 (10th Cir. 2009) ("We have recognized the [*Lackawanna*] plurality's second exception as good law.").  Defendant does not argue that either of these recognized exceptions applies to him.[2]  Perhaps Defendant is making a somewhat different argument when (1) he notes that the Colorado courts permitted him to challenge (albeit

---

[2]Defendant's right-to-counsel claim may appear to come within the *Lackawanna* exception for claims of "failure to appoint counsel."  *Lackawanna*, 532 U.S. at 404.  But the language of that exception is shorthand for "failure to appoint counsel for an indigent not represented by counsel."  As *Lackawanna* explains, the exception is based on "[t]he special status of *Gideon* [*v. Wainwright*, 372 U.S. 335 (1963)] claims in this context[, which] is well established in our case law.  See, *e.g.*, *Custis v. United States*, 511 U.S. 485, 496–497 (1994)."  *Id.*  And *Custis* in turn characterizes the basis of a *Gideon* claim as follows:  "*Gideon* established an unequivocal rule making it unconstitutional to try a person for a felony in a state court *unless he had a lawyer* or had validly waived one."  511 U.S. at 496 (ellipsis and internal quotation marks omitted; emphasis added).  As we read *Lackawanna*, the exception to its general rule applies only when the defendant had no counsel in the earlier state proceeding.  Apparently Defendant reads it the same way, as he does not argue that he can prevail if the *Lackawanna* opinion applies to him.

unsuccessfully) his 1983 conviction in a collateral attack on his 1988 convictions and (2) he then argues that *Lackawanna* "could not . . . want this court to have more concern for the finality of the conviction at issue here than Colorado has." Reply Br. at 11. But he does not suggest that Colorado would still permit a collateral attack on his 1983 conviction. In sum, the circumstances here would bar relief under *Lackawanna*.

Defendant's second argument is that it would be unfair to apply *Lackawanna* retroactively to him. He states that more than a decade before *Lackawanna* was decided, he had challenged the 1983 conviction when he opposed the proposed habitual-offender enhancement to his robbery charges. Had he known of the rule in *Lackawanna*, he says, he could have sought postconviction relief at that time, but once *Lackawanna* was decided, it was too late for him to seek state postconviction relief. He further points out that Tenth Circuit law before *Lackawanna* allowed a defendant to raise a collateral attack on a conviction used to enhance the sentence the defendant was serving. *See Gamble v. Parsons*, 898 F.2d 117, 118 (10th Cir. 1990).

We reject Defendant's retroactivity argument. Once the Supreme Court interprets a statute (here § 2254), that interpretation applies to every case under that statute that did not reach final judgment before the Court's decision. Because Defendant's suit under § 2254 had not even been commenced before

-19-

*Lackawanna*, the rule of *Lackawanna* must be applied. The Supreme Court has stated:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993). *Harper* was a civil case. The same doctrine had already been applied in criminal cases, *see Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), so we need not concern ourselves with whether this habeas proceeding should be treated as a criminal case or a civil case for retroactivity purposes. (It is worth noting, however, that *Griffith* does not say that a new rule declared by the Supreme Court necessarily applies to a postconviction challenge to a conviction that has become final. *See id.* at 327; *Teague v. Lane*, 489 U.S. 288 (1989) (stating factors that determine when a new rule should apply to convictions that have become final)).

This retroactivity doctrine applies even if the Supreme Court's decision is contrary to the precedent of this circuit. *See Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312 (1994).

> It is [the Supreme] Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law. A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.

*Id.* at 312–13. A litigant cannot argue that it reasonably relied on that circuit precedent. Reasonable reliance "is the very sort [of justification] that [the Supreme] Court, in *Harper*, found insufficient to deny retroactive application of a new legal rule." *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 753 (1995). "The essence of judicial decisionmaking—applying general rules to particular situations—necessarily involves some peril to individual expectations because it is often difficult to predict the precise application of a general rule until it has been distilled in the crucible of litigation." *Rivers*, 511 U.S. at 312. As the Court wrote in *Harper*: "In both civil and criminal cases, we can scarcely permit the substantive law to shift and spring according to the particular equities of individual parties' claims of actual reliance on an old rule and of harm from a retroactive application of the new rule." 509 U.S. at 97 (brackets and internal quotation marks omitted).

Nor do we perceive any due-process concern with applying *Lackawanna* here. Even if due-process doctrine could limit the retroactivity of a decision that neither makes previously legal conduct punishable nor increases the punishment for unlawful conduct, *but see United States v. Burnom*, 27 F.3d 283, 284 (7th Cir. 1994), retroactivity of the Supreme Court's decision in *Lackawanna* would violate due process only if the decision was "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001) (internal quotation marks omitted) (setting

standard for determining whether retroactivity of abolition of year-and-a-day rule violated due process). *Lackawanna*, however, did not overrule any precedent; and this court could hardly say that the decision of its superior was "indefensible."

Accordingly, we cannot review Defendant's argument that his 1983 conviction was invalid. *See Smith v. Jones*, 256 F.3d 1135, 1140, 1145–46 (11th Cir. 2001) (applying Supreme Court decision requiring issues raised in § 2254 habeas application to have been presented to state's highest court in petition for certiorari even though Eleventh Circuit precedent had been to the contrary).

## III.   CONCLUSION

We AFFIRM the judgment of the district court.